**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSHUA L.,** | : | **CIVIL ACTION** |
|     **Plaintiff,** | : | |
| | : | |
|   **vs.** | : | **NO.    23-cv-4528** |
| | : | |
| **CAROLYN COLVIN,**[1] | : | |
| **Commissioner of Social Security,** | : | |
|     **Defendant.** | : | |

<u>**MEMORANDUM OPINION**</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                     **December 18, 2024**

Plaintiff Joshua L. brought this action seeking review of the Commissioner of Social Security Administration's (SSA) decision denying his claim for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 403-433, 1381-1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 11) is **DENIED**.

## I.      PROCEDURAL HISTORY

On April 6, 2021, Plaintiff protectively filed for SSI, alleging disability since January 14, 2020, due to high cholesterol, hypertension, gastroesophageal reflux disease, left shoulder

---

[1] Carolyn Colvin was appointed as the Acting Commissioner of Social Security on November 30, 2024, after the resignation of Martin O'Malley.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ms. Colvin should be substituted as the defendant in this case. No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

surgery, inflammatory arthritis, kidney disease and liver disease.  (R. 10, 169, 274-77, 279-96).

Plaintiff's application was denied at the initial level and upon reconsideration, and he requested a

hearing before an Administrative Law Judge (ALJ).  (R. 161-99, 218-37).  Plaintiff, represented

by counsel, and a vocational expert (VE) testified at the July 11, 2022 administrative hearing.

(R. 42-80).  On July 26, 2022, the ALJ issued a decision unfavorable to Plaintiff.  (R. 7-30).

Plaintiff appealed the ALJ's decision, but the Appeals Council denied Plaintiff's request for

review on September 15, 2023, thus making the ALJ's decision the final decision of the

Commissioner for purposes of judicial review.  (R. 1-6).

On November 16, 2023, Plaintiff filed a complaint in the United States District Court for

the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On December 27, 2023, he

consented to the jurisdiction of the Honorable Richard A. Lloret pursuant to 28 U.S.C. § 636(C).

(Consent, ECF No. 7).  On April 4, 2024, Plaintiff filed a Brief and Statement of Issues in

Support of Request for Review, and on May 2, 2024, the Commissioner filed a response.  (Pl.'s

Br., ECF No. 11; Resp., ECF No. 12).  The case was reassigned from Judge Lloret to me on May

16, 2024, and Plaintiff filed a reply on July 1, 2024.  (Order, ECF No. 16; Reply, ECF No. 17).

On August 15, 2024, he was deemed to have consented to my jurisdiction due to his failure to

file the Consent to or Declination of Jurisdiction of a Magistrate Judge form.  (Order, ECF No.

19 (citing *Roell v. Withrow*, 538 U.S. 580 (2003))).

## II.    FACTUAL BACKGROUND[2]

The Court has considered the administrative record in its entirety and summarizes here

---

[2] Because the issues raised in Plaintiff's brief relate only to his physical impairments, this
Court does not summarize the evidence concerning his mental impairments.

the evidence relevant to the instant request for review.

Plaintiff was born on November 5, 1979, and was 40 years old on the alleged amended disability onset date. (R. 306). He previously worked as a crew supervisor for a groundskeeping company, a roofer and in home maintenance. (R. 312).

A.    **Medical Evidence**

On January 31, 2020, Plaintiff visited the Hershey Medical Center complaining of low back pain with radiculopathy, as well as ongoing left shoulder pain and "some bicep weakness" following five shoulder surgeries. (R. 650). However, a physical examination revealed no acute distress and full strength in the upper and lower extremities albeit with "some breakaway weakness in left elbow flexion." (*Id.*). Plaintiff also demonstrated a normal gait on tandem and toe testing and had a negative Hoffman's test. (*Id.*). He again reported low back pain with radiculopathy at a return visit on February 6, 2020, where he exhibited tenderness to palpitation at the L4-S1 paravertebral musculature and sacroiliac (SI) area bilaterally, as well as a positive straight leg test and left side lumbar facet loading. (R. 658). He was prescribed gabapentin and referred for an L5-S1 epidural steroid injection if the medication was not sufficiently effective within a few weeks. (*Id.*). On June 4, 2020, he received the injection on the left side. (R. 616).

On July 10, 2020, Plaintiff returned complaining of back pain with radiculopathy in his left leg, unimproved by the aforementioned treatments or physical therapy. (R. 602). He was referred for a lumbar MRI, which was performed on August 9, 2020. (R. 603). It showed an aligned spine with maintained vertebral heights but multilevel degenerative disc disease, especially at L3-L4 with moderate bilateral foraminal stenosis and a congenitally narrow spinal canal from L2 to L5. (R. 600-01). However, these findings were unchanged from a September 2019 MRI. (R. 601). The reviewing medical provider further noted "that surgery would not significantly change his symptoms as the level of pain he is experiencing as well as the

numbness and tingling do not seem to match the level of narrowing seen here." (R. 651). He also expressed doubt that injections would benefit Plaintiff. (*Id.*). Plaintiff received another L5-S1 epidural steroid injection on the left side on August 11, 2020. (R. 581). He received "near complete relief" immediately following the injection, but by a September 9, 2020 appointment his pain was "starting to return back to baseline" and again radiating down his legs, especially on the left. (R. 570). Upon examination, he again had a positive straight leg test and facet loading pain and tenderness to palpation over the L5-S1 facet joint, all on the left side. (Tr. 571). It was noted that Plaintiff was pursuing surgery. (*Id.*). On September 18, 2020, Plaintiff underwent a left-sided L5-S1 laminotomy with removal of epidural lipomatosis. (R. 540).

On October 27, 2020, Plaintiff reported that surgery "significantly improved" the pain in his left hip and leg; however, he complained of radiating right-sided hip pain beginning one week earlier, with a "sensation of something getting caught within the joint when he walks." (R. 399; *see also* R. 497 (December 2020 treatment note stating: "[H]e has been doing extremely well without any pain related to his back and leg. . . . He is very happy with the results of the surgery.")). He described the pain as worsening with movement and relieved by oxycodone from his back surgery and by crossing his right leg over his left while seated. (*Id.*). Upon examination, he had negative straight leg testing, full near-full strength bilaterally in hip flexion and full range of motion in the hips and spine, but he also had a stiff gait with preference of the left leg, pain upon spinal rotation and hip flexion and extension, and an inability to complete FABER and FADIR tests. (R. 401). Plaintiff was referred to orthopedics for follow up. (*Id.*). At that appointment one week later, he again reported improved back pain following his surgery but with new onset right hip pain (described as a "grinding sensation"), decreased range of motion, the need to frequently change positions, and positive FADIR and Thomas tests. (R. 486). He was then referred for physical therapy. (R. 487).

On February 9, 2021, at a follow up visit with his rheumatologist, Shirley Albano-Aluquin, M.D., regarding his arthritis, Plaintiff complained of fluctuating moderate to severe pain in his shoulders, feet and left hip and groin accompanied by intermittent mild to moderate swelling and stiffness in his hands, all worse with activity.  (R. 469).  On the other hand, he described "improvement of nerve pain and at least 80% improvement of back pain with improved mobility" following his back surgery, albeit with increased foot pain.  (*Id.*).  Physical examination showed an "initially stiff" gait with tenderness of the ankles, wrists, fingers, supraspinatus and bursa of the subacromial regions.  (R. 470).  Dr. Albano-Aluquin noted partial improvement with medication, increased his sulfasalazine and continued him on Lyrica and amitriptyline.  (*Id.*).  At another follow up with her on June 24, 2021, Plaintiff reported moderate to severe joint pain, especially in his hands, shoulders, hips and feet.  (R. 458).  The doctor noted that Plaintiff had a "moderate/partial response" to his drug regimen and that he could independently perform his ADLs, although Plaintiff indicated "severe limitations" in doing so. (*Id.*).  He also requested that Dr. Albano-Aluquin "ascertain his disability." (*Id.*).  Upon physical examination, Plaintiff had tenderness in his lumbo-sacral spinal area, hips and shoulders and tenderness and swelling in his bilateral wrists and PIP joints.  (R. 460).  His gait was normal with the ability to walk on heels and toes.  (*Id.*).  Dr. Albano-Aluquin diagnosed him with "chronic mixed pain from enthesopathic osteoarthritis and inflammatory arthritis/RA [rheumatoid arthritis] or spondylarthritis phenotype," especially in the hands, feet, hips and shoulders.  (R. 462).  She prescribed Methotrexate and directed Plaintiff to return in four to five months.  (*Id.*).

On September 11, 2021, Plaintiff went to the emergency room after he "was cutting into a gas tank when it flashed and caught his shirt on fire," resulting in second- and third-degree burns to his face, neck, abdomen and upper extremities.  (R. 734-35).  He complained of "severe pain" in his arms and "some tingling" in his fingers.  (R. 734).  He was transferred to a burn

center, where he underwent excisional debridement of the affected areas with application of Suprathel artificial skin replacement to his trunk, bilateral upper extremities and left thigh. (R. 794).

On June 24, 2021, Dr. Albano-Aluquin completed a Physical RFC Questionnaire provided by Plaintiff's counsel wherein she noted that Plaintiff had daily severe pain due to tender and swollen joints that would "constantly" interfere with his attention and concentration needed to perform simple work tasks. (R. 684-85). She opined that he could sit or stand for 20 to 30 minutes at a time before having to change position or walk around for a few minutes and sit or stand/walk for less than two hours in an eight-hour workday. (R. 686). She added that he would require more than five unscheduled breaks lasting more than five minutes each. (*Id.*). She denied that he would require a cane or other assistive device to walk. (*Id.*). Dr. Albano-Aluquin noted that Plaintiff could spend 20 percent of the day reaching and using his hands and fingers and occasionally lift and carry up to 10 pounds, turn his head and neck in all directions, and engage in all postural maneuvers. (R. 686-87). She predicted that Plaintiff would miss more than four days of work per month. (R. 687).

On July 22, 2021, State agency physician Toni Jo Parmelee, D.O., opined that Plaintiff could lift and carry 10 pounds frequently and 25 pounds occasionally, otherwise push and pull without limitation, sit or stand/walk for up to six hours per workday, frequently balance and climb ramps, and occasionally kneel, stoop, and crouch, but never crawl or climb ladders, ropes, and scaffolds. (R. 108-09). She added that Plaintiff had no environmental or manipulative limitations except that he should limit overhead reaching with the left hand to less than one hour per eight-hour workday. (R. 110).

On November 29, 2021, medical consultative examiner Ahmed Kneifati, M.D., conducted an Internal Medicine Examination of Plaintiff. (R. 1137-54). Plaintiff complained of

hypertension; grade 1 burns to abdomen and knees and grade 2 burns to his hand and forearm; past left rotator cuff tear in the left shoulder and arthritis in the right shoulder, resulting in limited range of motion and constant, sharp seven-of-ten pain, worse with motion or overhead reaching; constant, sharp seven-of-ten pain in his lumbar spine radiating to his feet and ankles and worse with sitting, movement, and temperature and humidity changes; kidney and fatty liver disease; and acid reflux. (R. 1137). Four prior shoulder surgeries were noted. (R. 1138). Plaintiff stated that he required help with ADLs. (*Id.*). Upon examination, which was limited by Plaintiff's refusal to change out of his clothes, he was in no acute distress with a normal gait and ability to walk on heels and toes without difficulty, although he could only squat halfway. (R. 1139). His musculoskeletal system and extremities were normal, except he had anterior tenderness in both shoulders and at his L4-L5 disc. (*Id.*). He also had intact hand and finger dexterity and full grip strength bilaterally and could tie laces and use zippers and buttons. (R. 1140).

In the attached Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Kneifati determined that Plaintiff could occasionally lift and carry up to 10 pounds, perform all postural activities, tolerate exposure to all environmental conditions (with greater tolerance of pulmonary irritants and vibrations), and reach bilaterally in all directions except overhead (where he could never reach); frequently handle, finger, feel, push/pull, and operate foot controls bilaterally; sit, stand, and walk, respectively, for 15 minutes, 30 minutes, and one hour at a time; sit, stand, and walk, respectively, for five, three, and two hours in an eight-hour workday; and occasionally perform all postural activities. (R. 1144-45). He observed that Plaintiff did not require a cane to ambulate. (R. 1144). He further noted that Plaintiff could perform all activities listed on the form, including shop, travel alone, walk at a reasonable pace on an uneven surface or up stairs without a hand rail, use public transportation, prepare simple meals and feed himself, care for his personal hygiene, and sort, handle, and use paper and files.

(R. 1148). Dr. Kneifati also found that Plaintiff had a normal range of motion in his cervical spine, elbows, wrists, hands, fingers, hips and ankles but a somewhat lesser range in his lumbar spine and shoulders. (R. 1151-52).

Upon reconsideration, on December 6, 2021, State agency physician Wadicar Fabian Nugent, M.D., opined that Plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally, otherwise push and pull without limitation, sit or stand/walk for up to six hours per workday, and never climb ladders, ropes, and scaffolds but occasionally perform all other postural maneuvers. (R. 139-40). He added that Plaintiff could finger and feel without limitation but that he was limited bilaterally in reaching in all directions and handling. (R. 140). He determined that Plaintiff must avoid concentrated exposure to extreme cold and vibration and even moderate exposure to hazards, but that he had no other environmental limitations. (R. 141).

Dr. Albano-Aluquin provided an updated Physical RFC Questionnaire on July 5, 2022. (R. 1158-61). New clinical findings included arthritis confirmed by x-rays and a "moderate response" to biologics, and she now noted that anxiety and stress were affecting Plaintiff's physical condition. (R. 1158-59). She also found greater limitations than previously, noting that Plaintiff could spend 20 percent of the workday using his fingers[3] and rarely lift and carry less than 10 pounds, turn his head and neck in any direction, and engage in any postural maneuver. (R. 1159-60). She opined that Plaintiff would require "constant" breaks throughout the workday and predicted that he would miss at least seven workdays per month. (R. 1160-61).

## B.    Non-Medical Evidence

The record also contains non-medical evidence. In an Adult Function Report dated June

---

[3] Dr. Albano-Aluquin left blank the fields regarding use of Plaintiff's hands, reaching and pushing/pulling. (R. 1161).

16, 2021, Plaintiff reported that he cannot lift objects over 10 to 15 pounds and that he has trouble walking due to swelling in his feet. (R. 325, 330). He claimed that unexplained weight gain prevented him "from doing a lot" and that he could not play baseball with his kids due to back pain and joint swelling. (*Id.*). He added that he can longer perform construction work or other physically laborious jobs due to loss of strength and dexterity. (*Id.*). He described his ADLs as taking a seated shower, walking around the house and watching television. (R. 326). Plaintiff stated that he has difficulties with personal care, including shaving, putting on socks or his belt, washing his hair, and using buttons and snaps. (*Id.*). He denied any difficulties feeding himself. (*Id.*). He recorded that he no longer cooks but can still prepare himself basic sandwiches. (R. 327). However, he is able to drive alone, ride in an automobile, mow his yard using a riding mower, and occasionally shop for groceries. (R. 327-28). On the form, Plaintiff checked boxes indicating difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, using his hands and climbing stairs, although he denied use of a cane or walker. (R. 330-31).

Plaintiff's wife completed a Third Party – Adult Function Report dated October 20, 2021, which largely tracks the report completed by Plaintiff. She indicated that Plaintiff "can't do much" (including cooking, driving, or performing indoor or outdoor chores) due to burns he suffered to his arms and hands in the gas tank accident but that his lifting limitations were due to his "left shoulder replacement." (R. 354, 357-58, 360). She claimed to bathe and dress Plaintiff, assist him with using the toilet, and cut food for him and noted that Plaintiff cannot go out alone or shop. (R. 356, 358). She endorsed the same checked-box limitations as set forth by Plaintiff, except she noted no difficulty with walking. (R. 360). She concluded the report with a lengthy explanation regarding Plaintiff's accident one month earlier and the difficulties he was experiencing as his wounds continued to heal. (R. 362).

At the July 11, 2022 administrative hearing, Plaintiff testified that his "major issue" is the injuries he received after assisting his neighbor[4] in cutting through an oil tank in September 2021, despite the fact he allegedly first became disabled in January 2020.  (R. 51).  He attributed the earlier onset date to problems with his left rotator cuff, which required multiple earlier surgeries, including a partial replacement.  (R. 51-52, 57-58).  However, when asked to clarify whether his injuries suffered in the accident or his left shoulder problems presented the greater impairment, he responded that his "most disabling issue" was his "left leg going numb."  (R. 53).  He testified that a September 2020 laminotomy at the L5-S1 "took some pressure off of" his back but recently his left leg was "getting affected again," necessitating a recent prescription for a cane and a planned follow up visit.  (R. 54).  Regarding his burns stemming from the accident, he stated that he lacks strength in his hands and wears compression gloves and sleeves.  (R. 55).

Plaintiff remained able to use a fork and spoon, except at the time his family had to cut food for him.  (R. 56).  He denied being able to use a zipper or small buttons, stated that he could drive only rarely due to back pain while sitting, and required assistance with putting on shoes, socks, and belts.  (R. 56-57).  He indicated that he could not "lift very much right now" due to the lack of strength in his hands and arms, nor could he reach overhead, to the side, or behind his back.  (R. 59-60).  He asserted that, with either hand, he could only lift a gallon of milk to waist level and that he could not pour from it.  (R. 59).  He attributed the limited range of motion on his right side to having a "frozen" right shoulder "right now . . . from overuse, compensating for the left," although his left shoulder remained the worse of the two.  (R. 60).  He also testified to arthritis in his back, shoulders, hips, wrists, hands, elbows, knees and "pretty much

---

[4] Plaintiff denied that he cut the gas tank himself, testifying instead that he merely "showed [the neighbor] where to cut it . . . ."  (R. 51).

every . . . other joint[ ].”  (R. 61).  He reported instability in his hips and knees and numbness

radiating down his leg.  (R. 62).

Plaintiff's ADLs included an hour of home physical therapy each day, getting dressed

with assistance, helping his disabled wife, caring for his children, mowing the yard with a riding

mower, and minimal cooking.  (R. 63-66).  He is able to brush his teeth but not comb his hair,

shave, or wash his back.  (R. 63, 69).  He stated that his children perform many household

chores.  (R. 68).  He explained that his compression gloves can become caught on things or

slippery, making it difficult to grip things or write.  (R. 67-68).  According to Plaintiff, he can

walk for about an hour a day and sit for longer periods, although not through an entire movie

because he has to get up to stretch.  (R. 68-69).


## III.    ALJ'S DECISION

Following the most recent administrative hearing, the ALJ issued a decision in which he

made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act

through June 30, 2023.

2.    The claimant has not engaged in substantial gainful activity since January 14,

2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease of

the lumbar spine, obesity, second and third degree burns and arthritis (20 CFR

404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments in 20 CFR

Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,

416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can sit, stand, or walk for 6 hours each per 8-hour workday. He can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl. He cannot climb ladders, ropes, or scaffolds. He can frequently reach overhead, in front and laterally. He can frequently handle with the bilateral upper extremity. He cannot have concentrated exposure to extreme cold, vibration, unprotected heights, or moving machinery parts.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on November 5, 1979 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 14, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 10-26).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 26).


## IV.     LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If she is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work.  If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In his request for review, Plaintiff raises three claims:

(1)    Substantial evidence does not support the ALJ's RFC assessment.

(2)    The ALJ failed to properly evaluate the opinion of A. Kneifati, M.D., the consultative examiner.

(3)    The ALJ's multiple errors with symptom evaluation compel reversal.

(Pl.'s Br., ECF No. 11, at 1) (reordered).

A.      **Substantial Evidence and the RFC (Reaching Limitations)**

1.      **The Parties' Positions**

Setting forth the background law regarding how an ALJ determines a claimant's RFC, Plaintiff posits that substantial evidence does not support his RFC because it fails to account for his reaching limitations.  (Pl.'s Br., ECF No. 11, at 7-8.)  He maintains that the ALJ's conclusion that he can reach frequently overhead, in front and laterally is inconsistent with the following evidence: reported symptoms and objective findings of pain, weakness and tenderness in the upper extremities and back; consultative examiner Dr. Kneifati's opinion that he could only occasionally reach bilaterally and never overhead; treating physician Dr. Albano-Aluquin's opinion that he had significant limitations with reaching; and his Adult Function Report noting loss of strength and manual dexterity, back pain, and hand swelling affecting his ability to lift, reach, and manipulate.  (*Id.* at 8 (citations omitted)).  In addition, Plaintiff points to his hearing testimony regarding multiple left shoulder surgeries due to a torn rotator cuff; conditions such as degenerative joint disease in that shoulder, pain in the other one, arthritis (including inflammatory enthesopathy arthritis), spinal stenosis and fibromyalgia; minimal hand strength and the need to wear compression gloves virtually around-the-clock since suffering burns in a fire accident, resulting in a diminished grip; the need for family members to cut his food for him; difficulty with aspects of dressing, shaving, combing and washing his hair, washing his back, reaching bilaterally, and lifting with his left arm due to pain and a lack of strength.  (*Id.* at 8-9 (citing R. 50, 55-57, 59-60, 63, 66-67, 69)).

Plaintiff insists that in light of this evidence the ALJ erred in not limiting him to occasional reaching.  (*Id.* at 9.)  He observes that he did not testify that he could reach on a continuous basis and that no physician determined that he had this ability.  (*Id.* (citing *Garcia v. Colvin*, 741 F.3d 758, 762 (7th Cir. 2013))).  He argues that the ALJ cited no specific evidence

supporting the RFC limitation to frequent reaching in all directions.  (*Id.*).  He acknowledges that

in making this determination the ALJ relied mainly on his full strength in his upper extremities,

full grip strength, and normal hand and finger dexterity, but he claims that these findings instead

addressed his "fine and gross manipulations" related to his hand strength and dexterity, not the

reaching limitations presented by his shoulder and back pain.  (*Id.* (citing R. 17, 19, 20, 22)).

Plaintiff maintains that this error was not harmless because if the ALJ had limited his RFC to

occasional reaching he would be unable to perform the jobs identified by the VE.  (*Id.* (citation

omitted)).

In response, the Commissioner asserts that Plaintiff concedes that the greater reaching

limitations determined by Dr. Kneifati in his "check-the-box opinion" were based on Plaintiff's

subjective claims of shoulder and back pain made to him during his one-off consultative

examination of Plaintiff, not on any objective findings.  (Resp., ECF No. 12, at 6-7).  He

continues that Plaintiff overlooks the significance of this concession in light of the ALJ's explicit

finding that Plaintiff's statements regarding the intensity, persistence and limiting effects of his

pain were less than fully consistent with the record evidence.  (Resp., ECF No. 12, at 6-7).  He

further notes that the ALJ emphasized that Plaintiff's diagnostic imaging, treatment history and

laboratory reports were generally inconsistent with his self-reported symptoms and limitations.

(Resp., ECF No. 12, at 6-7 (citing R. 16-18) (additional citations omitted)).  He highlights that

Plaintiff was primarily treated for his back and legs, with treating specialists finding that he had

no attendant weakness, that his reported pain and numbness was not consistent with MRI results,

and that surgery and injections would not change his reported symptoms.  (*Id.* at 7 (citing R. 602-

03, 605, 650-51, 668)).  He observes that Plaintiff's alleged "long history of left shoulder pain" is

undocumented in the record, that he was not referred for treatment during the relevant time

period (although he was advised to lose weight) and that x-rays showed only expected changes

due to his earlier surgery (and no abnormalities in his dominant, right shoulder).  (*Id.* at 7-8

(citing R. 19, 625, 628, 650)).  He adds that treating specialists found only that Plaintiff had

"some" reported bicep pain.  (*Id.* at 7 (citing R. 625, 650)).

The Commissioner points to other evidence also supporting the reaching limitations

determined by the ALJ.  He notes that Plaintiff did not report edema of his extremities until over

a year after his alleged onset date, that in any event none was found upon examination and that

no treatment was recommended for edema.  (*Id.* at 8 (citing R. 19, 460, 477, 729, 1140)).  He

continues that although Dr. Albano-Aluquin queried whether "we can ascertain his disability due

to severe limitations" reported by Plaintiff, she in fact found that he could independently perform

his ADLs and also recommended no treatment, other than ongoing use of over-the-counter

(OTC) medications to continue to control Plaintiff's alleged pain.  (*Id.* (citing R. 458)).

Furthermore, the Commissioner argues that Plaintiff essentially conceded his ability to reach

when he admitted to sawing through an oil tank during the alleged disability period – an action

that resulted in Plaintiff's burning himself and having to go to the emergency room, where he

exhibited normal range of motion in his neck and throughout his musculoskeletal system.  (*Id.*

(citing R. 20)).  He concludes based on the foregoing that substantial evidence supports the

ALJ's RFC finding that Plaintiff could reach frequently in all directions, even if some evidence

supports a contrary conclusion or the Court might reach a different result if it were to conduct a

*de novo* review.  (*Id.* at 9 (case citations omitted)).  He also denies that the ALJ was required to

prove non-disability by obtaining a separate medical opinion supporting the RFC.  (*Id.* at 10

(citing *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011))).

Plaintiff replies that the ALJ cited no specific medical evidence supporting his RFC to

reach in all directions frequently and that the Commissioner's reliance on treatment notes not

addressed by the ALJ constitutes an improper *ex post facto* justification.  (Reply, ECF No. 17, at

3-4 (citing *Dennis*, 2018 WL 2718245, at *5)).  He adds that the reaching limitations assessed by

Dr. Kneifati are supported by objective findings such as tenderness and/or swelling in Plaintiff's

shoulders, lumbar spine, and bilateral wrists and PIP joints and argues that the ALJ must have "a

good reason" for taking the "unusual step" of rejecting a consultative examiner's opinion.

(Reply, ECF No. 17, at 1 (citing R. 458, 460, 469-70, 602, 650, 658, 1137, 1140, 1151-52;

*Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014))).  Plaintiff characterizes as just another

"impermissible post-hoc rationalization" the ALJ's observation that Dr. Kneifati offered a check-

the-box opinion and points out that the nature of the opinion was dictated by the form provided

to him.  (*Id.* (citing *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Scivally v. Sullivan*, 966

F.2d 1070, 1076 (7th Cir. 1992); *Dennis v. Berryhill*, No. 16-6561, 2018 WL 2718245, at *5

(E.D. Pa. June 6, 2018))).  Plaintiff also repeats many of his arguments from his opening brief.

(*Compare* Pl.'s Br., ECF No. 11, at 8-9, *with* Reply, ECF No. 17, at 3-5 (citations omitted)).

### 2.    Analysis

After the step three listings determination, an ALJ must make an RFC assessment before

moving to steps four and five of the disability evaluation.  *See* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4); *Chandler*, 667 F.3d at 361.  An RFC assessment determines "what an individual

can do in a work setting in spite of the functional limitations and environmental restrictions

imposed by all of his or her medically determinable impairment(s)."  SSR 83-10, 1983 WL

31251, at *7.  The ALJ must include all credibly established limitations in the RFC, which is

"the most [a claimant] can still do despite [these] limitations."  20 C.F.R. §§ 404.1545(a)(1),

416.945(a)(1); *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (citing *Chrupcala v.

Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).  To determine the RFC, the ALJ must base the

assessment on "all of the relevant medical and other evidence."  20 C.F.R. §§ 404.1545(a)(3),

416.945(a)(3); *Fargnoli*, 247 F.3d at 41.  That evidence includes medical records, observations

made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. *Id.* The ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir. 1981).

Here, the ALJ determined in relevant part that Plaintiff's RFC includes the ability to "frequently reach overhead, in front and laterally." (R. 15). He based this finding on multiple largely normal systems reviews, examinations showing full strength in his upper extremities, x-rays showing only post-surgical changes in the left shoulder with "no major abnormalities" in either, resolution of the edema that Plaintiff attributed to his left shoulder surgery, and the fact that his pain was "controlled" with OTC medications, muscle relaxants and Methotrexate with no further treatment recommended. (R. 17-20 (citing Exs. B2F at 13, 15, 29, 203; B4F at 10-11; B5F at 29; B6F at 9; B9F at 8)). He also rejected Dr. Albano-Aluquin's findings of greater limitations as unexplained, inconsistent with the foregoing evidence as well as her own "routine and conservative treatment of medication management" for Plaintiff's conditions, and unsupported by her treatment notes, which where "routinely benign." (R. 23 (citing Ex. B2F at 11, 16, 50, 58)).

Accordingly, Plaintiff's claim that the ALJ failed to cite substantial evidence in support of the RFC reaching restriction is unfounded. (*See* Pl.'s Br., ECF No. 11, at 7-8; Reply, ECF No. 17, at 3-4). Although he points to evidence consistent with greater reaching restrictions, (Pl.'s Br., ECF No. 11, at 8-9), that alone is not a basis to disturb the ALJ's well-grounded decision. *See Simmonds*, 807 F.2d at 58 (even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.). Moreover, contrary to Plaintiff's contentions, the evidence cited by the ALJ did not relate solely to his manipulative abilities as reflected in his hand strength and dexterity, but instead involved

the shoulder and back pain that Plaintiff blames for his purportedly greater reaching limitations, such as successful pain management of his joint pain generally through medication, the lack of any need for other treatment, examination results showing full strength throughout the upper extremities as a whole (not just the hands), x-rays confirming the structural integrity of the shoulders specifically, and dissipation of the edema attributed by Plaintiff to the left shoulder surgery.  (R. 17-20 (citations omitted)).

Plaintiff observes that none of this evidence includes testimony from him or a medical opinion stating that he could reach on a continued basis, but the ALJ explained that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not fully consistent with the foregoing evidence and how in light of it the medical opinions were also less than fully persuasive.  (R. 16, 21-23 (citing Exs. B1F at 7; B2F at 11, 13, 16, 22, 50, 58, 150, 203; B4F at 11; B5F at 29; B6F at 16, 56; Ex. B9F at 4-7)).  Quoting *Garcia*, he suggests that an ALJ errs by determining an RFC if "[n]o physician testified – no medical records [re]vealed – that [claimant] has the residual functional capacity ascribed to him by the administrative law judge."  (Pl.'s Br., ECF No. 11, at 9 (quoting 741 F.3d at 762)).  But *Garcia* is distinguishable. As the quoted passage itself shows, the problem with the RFC in that case was not simply that no physician opined that the claimant had the abilities set forth therein, but that there were also "no medical records" of any sort to support the RFC as established by the ALJ.[5]  *See Garcia*, 741 F.3d at 762 ("*No evidence* supports th[e] [ALJ's] re-conclusion.") (emphasis added).  Here, on the contrary, there is the substantial evidence cited by the ALJ and set forth above that supports

---

[5] *Garcia* was unique in other ways as well.  The Seventh Circuit opined: "Garcia is one of the most seriously disabled applicants for social security disability benefits whom we've encountered in many years of adjudicating appeals from benefits denials. We are surprised that the government would defend such a denial."  *Garcia*, 741 F.3d at 762-63.

the RFC finding that Plaintiff can reach frequently in all directions.

As for Dr. Kneifati's opinion, Plaintiff maintains that it was supported by his objective findings of tenderness and swelling throughout the upper extremities and lumbar spine and that the Commissioner's contention that the ALJ properly rejected it as an unsupported check-the-box opinion amounts to a post-hoc rationalization that ignores the fact that Dr. Kneifati was presented by the SSA with the form to use.  (Reply, ECF No. 17, at 1).  However, the ALJ directly addressed the opinion's lack of support when he wrote in his decision: "[W]hen a medical opinion lacks such relevant supporting explanations, it cannot be said to be supported and, as it is lacking in that support, cannot be said to be persuasive."  (R. 22).  This determination was based in both fact and law.  At eight different points on the opinion form, it directed the medical professional completing the form to "[i]dentify the particular medical findings (i.e., physical exam findings, x-ray findings, laboratory test results, history, and symptoms including pain, etc.) which support your assessment or any limitations and why the findings support the assessment" or used similar language.  (R. 1143-48).  Dr. Kneifati wrote nothing in seven of these fields, including, importantly for present purposes, the one asking him to identify medical findings supporting any reaching limitations he determined.  (R. 1145).  Legally, such check-the-box forms with no narrative explanation constitute "weak evidence at best," and "where these so-called 'reports are unaccompanied by thorough written reports, their reliability is suspect.'" *Mason v. Shalala*, 944 F.2d 1058, 1065 (3d Cir. 1993) (quoting *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986))

Plaintiff cites cases from the Seventh Circuit Court of Appeals indicating that check-the-box forms may be entitled to significant weight, (Reply, ECF No. 17, at 1-2 (citations omitted)), but, as noted, the ALJ discounted Dr. Kneifati's opinion because it lacked "supporting explanations," not simply because of its format.  (R. 22).  Plaintiff also points to medical findings

21

arguably supporting the reaching limitations determined by the doctor, but in doing so it is he who offers a "post-hoc rationalization" because Dr. Kneifati failed to identify these findings when called upon in the opinion form to support his conclusions that Plaintiff could never reach overhead and only occasionally in all other directions.  (R. 1145).  As stated above, Plaintiff's ability to identify other evidence that might have supported a different RFC does not establish that the one determined by the ALJ is without a proper evidentiary basis.  *See Simmonds*, 807 F.2d at 58.

For these reasons, the request for remand on the proffered basis is denied.

**B.    Dr. Kneifati's Opinion[6]**

**1.    The Parties' Positions**

Plaintiff challenges as legally flawed "many" of the reasons identified by the ALJ for discounting consultative examiner Dr. Kneifati's opinion, which concluded, *inter alia*, that Plaintiff could occasionally lift and carry up to 10 pounds and reach bilaterally but never overhead.  (Pl.'s Br., ECF No. 11, at 10).  Setting forth the regulatory framework for evaluation of medical opinions, including the importance of considering supportability and consistency, he maintains that the ALJ should have found this opinion persuasive because it was well-supported by Dr. Kneifati and consistent with the other evidence in the record.  (*Id.* at 10-11).  He rejects the ALJ's finding that Dr. Kneifati's opinion was unsupported by his examination notes, pointing to Plaintiff's reported history of lumbar pain and left shoulder rotator cuff tear and pain, as well as the doctor's observations that Plaintiff exhibited tenderness in his shoulders and in his back at

---

[6] Plaintiff brings a separate claim asserting that the ALJ did not properly evaluate Dr. Kneifati's opinion, as a whole.  (Pl.'s Br., ECF No. 11, at 9-13).  Accordingly, the Court addresses it separately, notwithstanding some overlap with Plaintiff's first claim regarding his RFC reaching limitations.

L4-L5 and a limited range of motion in his shoulder and lumbar spine. (*Id.* at 11 (citing R. 1137, 1140, 1151-52)). He insists that if the ALJ had "actually considered the evidence," he would have accepted Dr. Kneifati's opinion as persuasive. (*Id.* (citing *Andrews v. Kijakazi*, No. 20-cv-1878, 2022 WL 617118, at *21-22 (M.D. Pa. Mar. 2, 2022); *Brownsberger v. Kijakazi*, No. 20-cv-1426, 2022 WL 178819, at *15-19 (M.D. Pa. Jan. 18, 2022))).

Furthermore, Plaintiff argues that the ALJ erred in determining that Dr. Kneifati's opinion was inconsistent with the other medical evidence. (*Id.* at 12). He notes that two pieces of evidence relied upon by the ALJ were hospitalization records related to Plaintiff's oil tank accident. (*Id.*). However, he claims that the opinion was consistent with other records reflecting back pain; moderate to severe shoulder and hand pain increasing with activity; bicep weakness; diagnoses for chronic back pain, lumbosacral radiculopathy, chronic mixed pain from enthesopathic osteoarthritis and inflammatory/rheumatoid arthritis of spondylarthritis phenotype (especially in the hands, feet, hips and shoulder); bilateral tenderness to palpitation in the L4-S1 paravertebral musculature, L5-S1 facet joint, SI area, hands, wrists, fingers and supraspinatus and bursa of the subacromial regions; positive left side lumbar facet loading and straight leg test; prescriptions for sulfasalazine, amitriptyline, Lyrica and Methotrexate; MRI results showing multilevel degenerative changes in the lumbar spine, including moderate bilateral neural foraminal stenosis at L3-L4 and a congenitally narrow spinal canal from L2 to L5; an L5-S1 interlaminar epidural steroid injection; and a left-sided L5-S1 laminotomy resulting in 80% improvement in his back pain but also increased feet pain. (*Id.* at 12-13 (citing R. 458, 460, 469-70, 540, 562, 570-71, 581, 600-01, 616, 650, 658)).

Again noting that Dr. Kneifati's check-the-box opinion constitutes weak evidence, the Commissioner counters that it is well-established that a physician's mere memorialization of a claimant's subjective complaints does not transform them into objective medical findings.

(Resp., ECF No. 12, at 9-10 (citing *Hatton v. Comm'r*, 131 F. App'x 877, 879 (3d Cir. 2005); *Morris v. Barnhart*, 78 F. App'x 820, 825 (3d Cir. 2003)) (additional citations omitted)).  He adds that the ALJ correctly observed that the revised regulations prohibit deferring or according any specific weight to a particular medical opinion.  (*Id.* at 10 (citing R. 21)).  He agrees that a medical opinion's supportability and consistency are the most important factors for an ALJ to consider, but he insists that the ALJ did exactly that when he stated that Dr. Kneifati failed to explain the basis for Plaintiff's purported reaching limitations and cited Plaintiff's reports of improvement, normal range of motion, and normal musculoskeletal systems examination results as inconsistent with the opinion.[7]  (*Id.* (citing R. 21-24; 20 C.F.R. § 404.1520c)).

    **2.**    **Analysis**

The Commissioner modified Social Security's regulations in 2017, changing the way ALJs evaluate medical evidence.  The prior regulations, governing claims filed before March 27, 2017, divided medical sources into three categories: treating, examining, and non-examining.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  ALJs were to weigh each medical opinion and could sometimes afford controlling weight to opinions from treating sources.  *See id.*

Under the new regulations, ALJs do not place medical sources into these categories and can no longer afford controlling weight to any opinion.  *See id.* §§ 404.1520c(c), 416.920c(c).  Instead, ALJs now evaluate the persuasiveness of each medical opinion and each prior administrative medical finding.  *See id.*  Five factors determine persuasiveness: (1) supportability; (2) consistency; (3) relationship with the claimant, including length, purpose, and extent of the treatment relationship, as well as frequency of examinations and whether the

---

[7] In reply, Plaintiff merely cuts and pastes arguments from his opening brief.  (*Compare* Pl.'s Br., ECF No. 11, at 11-13, *with* Reply, ECF No. 17, at 2-3 (citations omitted)).

medical source examined the claimant firsthand; (4) specialization; and (5) other factors, like "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *See id.* Supportability and consistency are the most important factors. *Id.* §§ 404.1520c(b)(2), 4l6.920c(b)(2). ALJs need not explain their determinations regarding the other factors, but they must discuss supportability and consistency. *Id.*

Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(2).

It is well established that an ALJ is free to reject a medical source opinion but in so doing must indicate why evidence was rejected so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). The must consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections" but need not discuss "every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004); *Burnett*, 220 F.3d at 122. Accordingly, "[t]he ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for [her] conclusion sufficient to enable meaningful judicial review." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (quoting *Burnett*, 220 F.3d at 120).

Here, after summarizing Dr. Kneifati's opinion, the ALJ explained:

> The extreme number of symptoms and limitations reported here have no support in Dr. Kneifati's examination notes, which reflect that the claimant had a mostly normal review of his musculoskeletal systems (Exhibit B9F pages 4 - 7). The consultative examiner noted the claimant had a normal gait, normal hand and finger dexterity and normal grip strength, with mostly normal range of motion throughout his musculoskeletal systems (Exhibit B9F pages 4 - 7). These observations are inconsistent with the sedentary and manipulative limitations he opined. Furthermore, the extreme limitations are offered without any real explanation. Pursuant to 20 CFR 404.1520c, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) the more persuasive the medical opinions will be." Conversely, when a medical opinion lacks such relevant supporting explanations, it cannot be said to be supported and, as it is lacking in that support, cannot be said to be persuasive. Additionally, Dr. Kneifati's opinions are inconsistent with the other objective evidence in the record, which showed the claimant routinely had a mostly normal review of his musculoskeletal systems (Exhibit B5F page 29; Exhibit B6F page 16). He also routinely reported an improvement in his symptoms (Exhibit B2F page 50). This would support the less restrictive limitations found in the above residual functional assessment. Therefore, this opinion is found to be unpersuasive.

(R. 22).

Plaintiff complains that the ALJ's supportability finding ignored his past rotator cuff tear, reports to Dr. Kneifati of shoulder and lumbar pain, and the doctor's consultative examination of him showing decreased range of motion and tenderness in his shoulders and back. (Pl.'s Br., ECF No. 11, at 10-11). The Court considers these points in turn. Plaintiff's torn rotator cuff did not mandate greater restrictions than determined by the ALJ because it is well-settled that "the RFC is based on [the claimant's] <u>functional limitations</u>—not her injuries alone." *Cuffee v. Berryhill*, 680 F. App'x 156, 160 (4th Cir. 2017) (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)) (emphasis in original; alterations added). Such is the case where the "damage may be permanent and not subject to the passage of time," let alone where, as here, the injury has

been surgically repaired. *Id.*; (*see also* R. 1138). Further, the fact that Dr. Kneifati recorded in his opinion Plaintiff's statements regarding his pain does not dictate a different RFC because "a medical source's recitation of subjective complaints is not entitled to any weight." *Hatton*, 131 F. App'x at 879 (citing *Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996) for the proposition "that a medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report").

As for Dr. Kneifati's objective findings of decreased range of motion and tenderness, the ALJ acknowledged that the consultative examination results were "mostly normal," although not fully so. (R. 22). These results included an also "mostly normal range of motion throughout [Plaintiff's] musculoskeletal systems," a determination well-grounded in the record. (R. 22; *see also* R. 1149-52 (noting that range of motion in the cervical spine, elbows, wrists, hands, fingers, hips and ankles were all within normal limits)). Plaintiff highlights his somewhat limited range of motion in his lumbar spine and shoulders, but even these findings do not contradict the ALJ's "mostly normal range of motion" determination. (*See* R. 1151-52 (finding that in the lumbar spine Plaintiff had a range of motion of 60 degrees out of 90 for flexion/extension and 10 degrees out of 20 for lateral flexion bilaterally, and in the shoulders bilaterally 130 degrees out of 150 for abduction and forward elevation, 20 degrees out of 30 for adduction, 30 degrees out of 40 for internal rotation, and 60 degrees out of 90 for external rotation)). Although the ALJ did not specifically address Plaintiff's lumbar spine and shoulders when discussing his range of motion, he was not required to mention every piece of evidence in the record. *Hur*, 94 F. App'x at 133. His supportability analysis, citing Plaintiff's "mostly normal" musculoskeletal functioning and highlighting Dr. Kneifati's "lack[ ] [of] relevant supporting explanations" for the

proffered limitations, allows this Court to conduct a "meaningful judicial review."[8] *Diaz*, 577

F.3d at 504; (R. 22 (citing Ex. B9F at 4-7)).

Regarding consistency, Plaintiff notes that two pieces of evidence cited by the ALJ in

support of his determination that Dr. Kneifati's opinion was inconsistent with the other objective

evidence in the case file were records from Plaintiff's hospitalization after he was burned in a gas

tank fire. (Pl.'s Br., ECF No. 11, at 12). But he does not explain why these records showing

largely normal musculoskeletal systems upon examination do not constitute substantial evidence

simply because they pertain to Plaintiff's hospitalization for injuries suffered in an accident.

Moreover, he ignores the fact that the ALJ also cited other evidence inconsistent with Dr.

Kneifati's opinion, such as records showing that Plaintiff "routinely reported an improvement in

his symptoms." (R. 22 (citing Ex. B2F at 50); *see also* R. 497 ("[H]e has been doing extremely

well without any pain related to his back and leg. . . . He is very happy with the results of the

surgery.")). Plaintiff points to other evidence that tends to comport with Dr. Kneifati's opinion,

(Pl.'s Br., ECF No. 11, at 12-13 (citations omitted)), however, the existence of evidence

consistent with the opinion is not alone a basis to upset the ALJ's decision. *See Simmonds*, 807

F.2d at 58.

**C.    Symptom Evaluation**

**1.    The Parties' Positions**

In Plaintiff's third and final claim, he contends that the ALJ repeatedly erred in

evaluating his symptoms. (Pl.'s Br., ECF No. 11, at 13-16). Pointing to much of the same

---

[8] These features of the ALJ's decision distinguish this case from those cited by Plaintiff, where the ALJ failed to cite any specific supporting evidence, did not explain how he evaluated supportability (or consistency), and/or otherwise so "tersely addressed" these factors that the decision was "too opaque" to allow for judicial review. *See Andrews*, 2022 WL 617118, at *21-22; *Brownsberger*, 2022 WL 178819, at *15-19.

evidence cited in his first two claims, he maintains that the record supports his pain allegations. (*Id.* at 13 (citing additional medical evidence reflecting tenderness in the supraspinatus and bursa of the subacromial regions, stiff gait favoring the left leg, positive FADIR and Thomas tests, tight hamstrings, and pain with spinal rotation and hip flexion and extension)). Furthermore, he questions the ALJ's conclusion that his treatment was merely routine and conservative in light of his L5-S1 laminotomy, lumbar interlaminar epidural steroid injections, treatment with specialists, and need for emergency care and maintains that he would not have undergone this treatment unless he suffered from debilitating impairments. (*Id.* at 14 (citing R. 21, 460, 469-70, 486-87, 562; SSR 16-3p, at *8)). He adds, moreover, that the ALJ was not permitted to discount his subject testimony about his symptoms without identifying what more aggressive treatment options he believed Plaintiff failed to pursue. (*Id.* at 14-15).

Turning specifically to his fibromyalgia, Plaintiff takes issue with the ALJ's determination that his pain allegations were not supported by objective findings, observing that even without such findings, fibromyalgia can serve as the basis for a disability claim and that no test exists to measure one's pain from the condition. (*Id.* at 14 (case citations omitted)). Lastly, Plaintiff argues that the ALJ did not specify which basic work activities he purportedly could perform. (*Id.* at 15 (citing R. 24)). He continues that although the ALJ noted some of his ADLs at the beginning of the decision he did not discuss them further as allegedly required by SSR 16-3p. (*Id.*). Specifically, he accuses the ALJ of disregarding his self-reported difficulties with personal care, food preparation and consumption, dressing, using buttons, driving, household chores, mowing the lawn (even on a riding mower), lifting (especially on the left), reaching (bilaterally), and manipulation. (*Id.* (citing R. 56-57, 59-60, 63-66, 69, 326-27, 330)). He summarizes that he performed only "minimal" ADLs without having to meet any performance or production standards and insists that the ALJ failed to explain how he could perform work tasks

in a competitive work environment where such flexibility would not exist.  (*Id.* at 15-16 (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012))).

In response, the Commissioner notes that Dr. Albano-Aluquin found that Plaintiff could independently perform his ADLs (contrary to his allegations in the third claim) and recommended no treatment, aside from continued use of OTC medications for pain.  (*Id.* at 7 (citing R. 458)).  He points to other instances in which Plaintiff received limited or no treatment as well.  (Resp., ECF No. 12, at 7-8 (noting instances in which "no further treatment was recommended")).  Further, the Commissioner points to objective medical evidence tending to support the ALJ's RFC rather than Plaintiff's subjective complaints of limiting pain.  (*Id.* at 7 (citations omitted)).

### 2.    Analysis

Under Social Security Ruling 16-3p, the ALJ must follow a two-step process in evaluating the plaintiff's subjective symptoms: (1) determine if there is an underlying medically determinable physical or mental impairment, shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the plaintiff's pain or symptoms; then (2) evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the plaintiff's functioning.  SSR 16-3p, 2017 WL 5180304, at *3-8 (Oct. 25, 2017).  In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must consider relevant factors such as the objective medical evidence, evidence from medical sources, treatment course and effectiveness, daily activities, and consistency of the plaintiff's statements with the other evidence of record.  *Id.*

An ALJ is required to "give serious consideration to a claimant's subjective complaints of pain [or other symptoms], even where those complaints are not supported by objective evidence."  *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*,

765 F.2d 31, 37 (3d Cir. 1985)).  If the complaints "are not fully credible," the ALJ "has the

right, as the fact finder, to reject partially, or even entirely, such subjective complaints . . . ."

*Weber v. Massanari*, 156 F. Supp. 2d 475, 485 (E.D. Pa. 2001).  However, "a[n] ALJ must give

great weight to a claimant's subjective testimony . . . when this testimony is supported by

competent medical evidence."  *Schaudeck*, 181 F.3d at 433.

In this case, the ALJ determined that although Plaintiff "reported that his musculoskeletal

pains were the main impairments that prevented him from working[,] the objective medical

evidence in the record does not show that the claimant's impairments are as debilitating as he

alleges or cause restrictions greater than the above listed residual functional capacity."  (R. 16).

He pointed to the following evidence supporting this conclusion.  Noting that Plaintiff's imaging

results "routinely showed no major abnormalities," he highlighted MRIs showing mostly mild

degenerative disc changes in the lumbar spine, stable over time with intact vertebral body heights

and normal alignment, as well as x-rays reflecting a normal right hip, normal shoulders except

for post-surgical changes, and normal lumbosacral spine with normal SI joints and no

spondylolisthesis.  (R. 17, 19 (citing Exs. B2F at 49, 150, 153-54, 214; B9F at 8)).  The ALJ also

cited Plaintiff's January 2020 "mostly normal review of systems," which included a normal gait,

full strength in the upper and lower extremities, no acute distress, and negative Hoffman's test.

(*Id.* (citing Ex. B2F at 203)).  He highlighted successful treatment Plaintiff had received, such as

oral steroids that proved "helpful" and September 2020 back surgery that "significantly

improved the pain in his left hip and leg."  (*Id.* at 17-18 (citing Exs. B1F at 7; B2F at 203)).

The record of Plaintiff's December 2020 examination following his back surgery, in

particular, provides substantial support for the ALJ's determination.  As described by the ALJ:

> [T]he claimant presented for examination and reported that he was
> doing extremely well, without any pain or symptoms related to his
> back or leg. Additionally, he denied experiencing S1 radicular

31

> symptoms that he had prior to his surgery, and he denied having
> any new onset of radicular symptoms, new numbness or tingling in
> his bilateral lower extremities or new bowel or bladder urgency or
> incontinence. Further, he reported that he was very happy with the
> results of his surgery. On examination, he continued to have a
> mostly normal review of systems, with a normal gait, clean and
> well healed incisions, without signs of erythema, edema or
> infection and he was able to perform a heel/toe walk. Furthermore,
> he had 5/5 motor strength in his hips, knees, ankles and great toe,
> normal sensation and normal reflexes. Additionally, he had no
> tenderness noted. The claimant was noted to be doing well and
> very happy. He was advised to follow up as needed. However, no
> further treatment was recommended.

(R. 18 (citing Ex. B2F at 50-51)) (internal citations omitted).

Although Plaintiff subsequently complained of a return of some symptoms at a June 2021 office visit, as acknowledged by the ALJ, notes from this visit reflect that Plaintiff's "lumbar spine pain and radiculopathy was [sic] still better since his surgery," and "[n]o further treatment was recommended." (R. 19 (citing Ex. B2F)). The ALJ further observed that upon examination at the visit Plaintiff had a less-than-full range of motion in his lumbar spine and some tenderness and swelling in his hips and shoulders, especially in the left one, but that he had a normal gait and toe/heel walk, as well as intact strength. (*Id.* (citing Ex. B2F at 19)). Further, the ALJ explained that at another visit two months later Plaintiff reported that his pain was controlled with OTC medications and muscle relaxants and that despite ongoing inflammation his symptoms were improving. (*Id.* (citing Ex. 4F at 10-11)).

Given this body of evidence, it is beyond question that substantial support exists for the ALJ's determination that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations," (R. 16), even if Plaintiff is able to point to other evidence tending to support his claims of greater impairment.

Plaintiff also attacks the ALJ's refusal to fully credit his subjective complaints based on the purportedly "routine and conservative treatment he received," which he notes included back

surgery among other treatments.  (R. 21 (citations omitted)).  The Court agrees with Plaintiff that back surgery is not properly classified as "routine and conservative."  *See Fleming v. Comm'r of Soc. Sec.*, No. 1:19-CV-00028, 2020 WL 2124155, at (W.D.N.Y. May 5, 2020) (conclusion that treatment was "routine and conservative" was "undermined by Plaintiff's surgery").  However, this error by the ALJ was harmless because he gave additional reasons backed by substantial evidence for discounting Plaintiff's subjective complaints, namely the "generally normal review of his musculoskeletal systems [and] the general[ly] normal motor exam findings" both summarized above.  (R. 21 (citing Exs. B1F – B10F)); *see also Alexander v. Saul*, 817 F. App'x 401, 404 (9th Cir. 2020) ("However, the error was harmless because the ALJ's decision was based on other specific and legitimate reasons that are supported by substantial evidence in the record.") (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)); *Whitten v. Soc. Sec. Admin, Comm'r*, 778 F. App'x 791, 796 (11th Cir. 2019) (per curiam) ("This was error, but it was harmless because the ALJ gave other reasons—all supported by substantial evidence—for discounting [the evidence].") (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)); *Lockwood v. Comm'r Soc. Sec. Admin.*, 397 F. App'x 288, 290 (9th Cir. 2010) ("However, this error was harmless because the ALJ's other reasons for finding Lockwood not credible were sufficient and were supported by substantial evidence.") (citing *Carmicle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008)).

As for Plaintiff's fibromyalgia, he observes that a lack of supporting objective medical evidence is not a basis to discount the limiting effects of this ailment because no test exists to gauge its severity.  (Pl.'s Br., ECF No. 11, at 14); *see also Osborne v. Berryhill*, No. 16-96, 2017 WL 818846, at *3 (W.D. Pa. Mar. 2, 2017) ("In evaluating fibromyalgia, courts acknowledge that symptoms of the disease are entirely subjective and medical testing may not be able to assess its severity.").  Nevertheless, "a claimant who has been diagnosed with fibromyalgia will not

automatically be classified disabled under the Social Security Act." *Osborne*, 2017 WL 818846, at *3 (citations omitted). "Even in fibromyalgia cases, the ALJ must compare the objective evidence and the subjective complaints and is permitted to reject plaintiff's subjective testimony so long as he provides a sufficient explanation for doing so." *Id.* (quoting *Nocks v. Astrue*, 626 F. Supp. 2d 431, 446 (D. Del. 2009)). Here, the ALJ explained that Plaintiff's fibromyalgia did not constitute a medically determinable impairment because Dr. Albano-Aluquin failed to exclude other potential causes of the alleged pain, as required by applicable authority. (R. 13); *see also* SSR 12-2p, 2012 WL 3104869, at *3 (July 25, 2012) (establishing fibromyalgia requires, *inter alia*, "[e]vidence that other disorders that could cause the symptoms . . . were excluded"). Instead, the relevant treatment record merely states "ascertained fibromyalgia" without any further elaboration. (R. 672).

Finally, Plaintiff posits that the ALJ failed to identify which work activities the ALJ believed he could perform. (Pl.'s Br., ECF No. 11, at 15; *see also* R. 24 (concluding that the evidence shows that Plaintiff "retains the capacity to function adequately to perform many basic activities associated with work")). However, this argument ignores the RFC set forth by the ALJ detailing Plaintiff's abilities to lift, carry, sit, stand, walk, climb ramps and stairs, balance, stoop, kneel, crouch, crawl, reach, and handle. (R. 15); *see also Ramirez*, 372 F.3d at 551 n.1 ("Residual functional capacity is defined as 'what a [claimant] can still do despite his limitations.'") (quoting 20 C.F.R. § 416.945(a)). Further, his related contention that SSR 16-3p required the ALJ to "return[ ]" to his abilities to perform ADLs after discussing them at the outset of the decision is not borne out by a review of that ruling, which merely requires that the ALJ "consider" ADLs when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms. (Pl.'s Br., ECF No. 11, at 15); SSR 16-3p, 2017 WL 5180304, at *7. Here, the ALJ fulfilled this requirement when he addressed Plaintiff's hearing testimony

regarding his difficulties with putting on his shoes, cutting his food, writing his name, walking or

sitting for extended periods, and lifting more than a few pounds, as well as Dr. Albano-Aluquin's

treatment note reflecting that Plaintiff claimed "severe limitations" when performing ADLs. (R.

16, 19 (citing Exs. B3E at 5; B2F at 11)). Of course, the ALJ ultimately determined that "the

objective findings in this case fail to provide strong support for the claimant's allegations of

disabling symptoms and limitations," but this hardly means that the ALJ did not consider them.[9]

(R. 16).


## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is denied.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

[9] Plaintiff cites *Bjornson,* 671 F.3d at 647, for the proposition that "[i]n a competitive workplace, a claimant must adhere to a schedule, work independently, and meet performance/production standards," and claims that the ALJ failed to explain how Plaintiff could complete work activities in such an environment where he had difficulty performing ADLs. (Pl.'s Br., ECF No. 11, at 16). In *Bjornson*, the ALJ credited the claimant's statements regarding her ability to perform ADLs, but then improperly relied upon these in-fact limited ADLs to question her credibility regarding her limitations and ultimately conclude that she could meet competitive work standards. *Id.* Here, by contrast, immediately after discussing Plaintiff's ADLs the ALJ concluded that these "statements concerning the intensity, persistence and limiting effects of [his] symptoms" were not fully consistent with the record evidence. (R. 16). Later in the decision, the ALJ determined that Plaintiff had the functional abilities set forth in the RFC, not because of the ADLs he could perform (as in *Bjornson*), but because of, *inter alia*, his "generally normal review of musculoskeletal systems" and "general[ly] normal motor exam findings[.]" (R. 21 (citations omitted)).